PERCIVAL W. CLEMENT *v.* HORACE F. GRAHAM, STATE AUDITOR.

May Term, 1905.

Present: ROWELL, C. J., TYLER, MUNSON, START, WATSON, HASELTON, and POWERS, JJ.

Opinion filed February 2, 1906.

*Mandamus to Public Officers—Private Relator—Pleadings in Mandamus—Complaint—Sufficiency—Motion to Dismiss— Motion to Quash—Judicial Notice—Answer—Function of —Averment on Information and Belief—English Statutes*

*How Far Part of Our Common Law—Auditor of Accounts*
*—Public Records—Citizen's Right to Inspect—Ministerial*
*Duty.*

The statute of 1782, adopting the common law of England, was largely
declaratory of the common law as here practiced and understood,
and should be construed as including within the common law
adopted such English statutes as were passed before October 1,
1760, for the alteration and explanation of the common law, and
which were not repugnant to the Constitution or some Act of the
Legislature, and were applicable to the circumstances of this State.
The various subsequent changes in the wording of our statute were
not intended to work a change in the law itself.

The statute of 9 Anne, Ch. 20, respecting pleadings and proceedings in
actions of mandamus, is a part of the common law so adopted.

By No. 74, Acts of 1876—V. S. 1617, 1620—the provisions of the statute
of Anne were, in effect, extended to all cases of mandamus.

A mandamus proceeding is an action at law and, under our practice,
the complaint takes the place of the alternative writ, the answer
takes the place of the return, and subsequent pleadings may be had
till issue is joined on the merits.

The pleadings are to be governed by the rules of the common law,
and must, as to substance, meet the requirements of good pleading
in an ordinary action at law.

Under the rule of pleading that each party tacitly admits all material
facts adversely alleged which he does not specifically deny, all
material allegations in the complaint which the answer denies
only on information and belief, and all material allegations which
the answer neither expressly admits nor denies, but calls upon the
relator for his proof, are admitted to be true.

But allegations which are only conclusions of law from the facts stated,
and not traversable, are not thus admitted.

A motion to dismiss does not reach defects in the complaint which
pertain only to the right of recovery on the merits. If the com-
plaint is defective in substance, advantage thereof may be taken
by motion to quash at any time before the peremptory writ is
awarded.

In mandamus proceedings where no traverse is filed to the answer, the
matters in controversy are usually determined on the complaint
and answer. But in this case, though no traverse was filed, testi-
mony was taken, filed, and used at the hearing by both parties with-

out objection. They thereby treated the case as if a traverse had been filed, and the Court does the same.

Courts are bound to take notice of all common law rights and duties and of all general customs, hence they ought not to be stated in pleading.

A complaint for a mandamus to the Auditor of Accounts commanding him to exhibit to the relator vouchers on file in his office, alleged in positive terms the official character of the defendant and that it is his statutory duty to exact such vouchers and to keep them on file in his office. *Held*, that if, as stated in the complaint, it is the duty of the Auditor to exhibit such vouchers to citizens and tax-payers, the complaint sufficiently states the origin of that duty; for, if such duty exists, it arises at common law and the Court takes judicial notice thereof.

It need not be stated in the complaint that there were any such vouchers in the Auditor's office or in his possession at the time of the demand for an inspection and the refusal, nor what they were, nor that it was within the power of the Auditor to comply with the demand; for the Court takes judicial notice of the statutory duty of the Auditor to exact such vouchers, and to keep them on file, and of their general nature, and the law presumes that public officers have performed their statutory duty.

If such vouchers are public records, they are so as matter of law, and therefore, that fact need not be averred in the complaint.

In a complaint for mandamus it is sufficient to describe with reasonable certainty the thing to be done; especially is this true in the case of a public officer who is commanded to perform a public duty, and the facts constituting the act are within his personal knowledge.

That which already sufficiently appears in the pleading of either party without formal allegation, need not be expressly averred.

The averment on information and belief that the relator has no other adequate remedy is insufficient; but the defect is cured when it is apparent from the other averments in the complaint that such is the fact.

In V. S. 305, the word "bill" includes all claims and accounts which by law may be presented to the Auditor for allowance, and the word "vouchers" includes all books, papers, receipts, receipted bills, and documents which serve to prove the truth of the claims and accounts so presented.

Vouchers used, filed, and kept as required by V. S. 305 are public documents.

At common law, all persons who have the requisite interest in the subject-matter thereof have the right to inspect public records and public documents, when such inspection is not detrimental to the public interests. And the existence of this right regarding the vouchers, files, papers, and records in the office of the Auditor of Accounts is impliedly recognized by No. 24, Acts of 1904.

Whether the injunctions of the law regarding the allowance of claims and the drawing of orders by the Auditor have been and are followed is a question involving public rights in which all citizens and taxpayers are alike interested. If by negligence or misconduct bills have been or are being allowed contrary to law, public policy demands that such evils be remedied and that proper facilities be afforded to bring about this result.

For this purpose, under reasonable rules and regulations, the citizens and taxpayers of this State have the right to inspect the public records and public documents kept in the office of the Auditor of Accounts; and the Auditor owes to the public the correlative duty to accord that right.

This duty of the Auditor to accord to taxpayers such right of inspection, when in contemplation of law an occasion arises for its exercise, is ministerial in its nature.

The refusal by the Auditor of Accounts to accord this right in circumstances where the law requires it, is a detriment to the public interests, and relief will be granted by awarding a mandamus.

Although the office of the Auditor of Accounts is a branch of the Executive Department of the Government, this does not place the Auditor beyond the reach of mandamus to compel the performance of purely ministerial public duties appertaining to his office.

To maintain mandamus in this case the relator need not have any pecuniary or other interest in the subject-matter, except such interest as he has in common with the other citizens and taxpayers of the State.

When relief by mandamus is sought merely for the protection of private rights, the relator must show some special or personal interest in the subject-matter, since he is regarded as the real party in interest; but when the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party in interest, and it is sufficient if it appears that the relator is a citizen and as such is interested in the execution of the laws.

V. S. 320, as amended by No. 21, Acts 1904, providing that the legis-
lative committee on claims in making their examination of claims
presented against the State, may examine the vouchers, files, and
papers in the office of the Auditor of Accounts and papers of his
office connected therewith, does not take away any right of inspec-
tion which existed at common law.

The Auditor of Accounts may make and enforce such reasonable rules
and regulations regarding the inspection of the public records and
public documents in his office as may be necessary for their safety,
and to prevent disproportional interference with the proper per-
formance of the duties of the office.

PETITION FOR MANDAMUS to the Auditor of Accounts,
brought to the Supreme Court for Rutland County at its Octo-
ber Term, 1904. Heard at the January Term, 1905, on peti-
tion, answer, and testimony taken and filed. The opinion
fully states the case.

*Cowles & Moulton* for the relator.

The vouchers required by law to be kept in the office of
the State Auditor are public records. 24 Am. & Eng. Enc.
159, 170; *State ex rel. Ferry* v. *Williams,* 41 N. J. L. 232;
*Payne* v. *Staunton,* 46 S. E. R. 927, 933; *Brown* v. *Knapp,*
54 Mich. 132, 52 Am. Rep. 800; *Mexican R. Co.* v. *Jarvis,*
69 Tex. 527; *Perkins* v. *Cummings,* 66 Vt. 485; *Highsmith* v.
*State,* 25 Tex. Supp. 137; *Smith* v. *Lawrence,* 12 Mich. 431;
*Carrington* v. *Potter,* 37 Fed. 767; *Noble* v. *Douglass,* 56 Kan.
92; *Cruse* v. *McCauley,* 96 Fed. 369.

A citizen and taxpayer, having a legitimate purpose for
so doing, has a right, at proper times and under reasonable
regulations, to examine public records. I. Morawetz on Priv.
Corps. § 473; *Lewis* v. *Brainard,* 53 Vt. 510; *Com.* v. *Phoenix
Iron Co.,* 105 Pa. St. 111; *Matter of Steinway,* 159 N. Y. 250;
4 Thompson on Corps. § 4406; *State ex rel. Wellford* v. *Wil-
liams,* 110 Tenn. 549; *State ex rel. Ferry* v. *Williams,* 41 N.

J. L. 332, 32 Am. Rep. 219; *King* v. *Babb*, 3 T. R. 582; *Herbert* v. *Ashburner*, 1 Wils. 297; 2 Dillon Mun. Corps. (4th ed.) § 848; Glover on Mun. Corps. 262; Wilcox on Mun. Corps. 347; Meechem Pub. Officers, § 687; 1 Dillon, § 303; *King* v. *Justices of Leicester*, 4 B. & C. 891, (1825); *Rex* v. *Guardians of Great Farringdon*, 9 B. & C. 541, (1829); *Rex* v. *Justices of Nottingham*, 3 A. & E. 500, (1835); *King* v. *Clear*, 4 B. & C. 899, (1825); *Rex* v. *Vestrymen of St. Marylebone*, 5 A. & E. 268, (1836); *Rex* v. *Justices of Straffordshire*, 6 A. & E. 84, (1837); *Ex parte Briggs*, 1 E. & E. 879, (1859); *Regina* v. *Harrison*, 9 Q. B. 793; *Payne* v. *Staunton*, 46 S. E. R. 927; *People ex rel. Henry* v. *Cornell*, 32 How. Pr. 149; *State ex rel. Colscott* v. *King*, 154 Ind. 621; *Tex.* v. *White*, 74 U. S. 700; *Brewer, State Auditor,* v. *Watson*, 61 Ala. 310.

The right to examine documents includes the right to make copies from them. 4 Thomp. Corps., § 4421; *Clay* v. *Ballard*, 87 Va. 787; *Brouwer* v. *Cotheal*, 10 Barb. 216.

When the examination is sought for a public purpose, the interest of a citizen and taxpayer alone, without any other special or personal interest, is sufficient. *King* v. *Algood*, 7 T. R. 746; *Rex* v. *Merchant Tailor's Ass'n.*, 2 B. & Ad. 115; *Huylar* v. *Craigin Cattle Co.*, 40 N. J. Eq. 392; Beach, Injunctions, § 1300; *Littler* v. *Jayne et al.*, 124 Ill. 123; *Winn* v. *Shaw*, 87 Colo. 631; High, Extra. Rem. (3rd ed.) 431; *People ex rel. Kay* v. *Swanstorm*, 79 App. Div. (N. Y.) 94; 2 Spelling, Extr. Relief, § 1624; *In re Caswell*, 27 L. R. A. 82.

The fact that it would cause inconvenience to permit the examination of the vouchers, is not a sufficient ground for refusing that right. *Burton* v. *Twite*, 78 Mich. 363; *Silver* v. *People*, 45 Ill. 224; *State* v. *St. Louis Ry. Co.*, 29 Mo. App. 301.

Mandamus is the proper remedy. The relator has no other remedy. *Proprietors of St. Luke's Church* v. *Slack,* 7 Cush. 226; *State* v. *Bruce,* 3 Brev. (So. Car.) 264; *Ellsworth* v. *Doewart,* 95 Iowa 108.

*W. W. Miles,* and *Horace F. Graham* for the defendant.

Mandamus rests upon a duty to be performed by a public officer, or by some one engaged in the performance of a public duty. 3 Black's Com. 110; *Page* v. *Clopton,* 2 Va. Law J. 560; *Legg* v. *Mayor of Annapolis,* 42 Md. 203; Bouvier's Law Dic. Vol. 11, p. 100 (5th ed.)

According to the rules of pleading, therefore, the relator must expressly allege that defendant owed some duty to him or to the public. 14 Am. & Eng. Enc. (1st ed.) 222; 1 Chit. Pl. (14th ed.) 261, 383.

Mandamus also rests upon the right or interest of the relator in the subject-matter, which the relator must show by clear and distinct allegations of facts showing the right or interest claimed. *Bank* v. *Canal Com.,* 10 Wend. 25; *Amos* v. *Burros,* 11 Ill. 383; *State* v. *Fletcher,* 39 Mo. 388; *State* v. *Everitt,* 52 Mo. 89; *Ex parte Fleming,* 2 Wall. 759.

The relator should have alleged that the vouchers are public records, in order to give him the right to inspect them because he is a citizen and taxpayer. He must also allege facts showing that he has no other adequate remedy. *Richard* v. *Wheeler,* 2 Aik. 369; *Bailey* v. *Oviatt,* 46 Vt. 627; *Sabin* v. *Rounds,* 50 Vt. 74; *Cook* v. *Peacham,* 50 Vt. 231.

A public record is a written memorial made by a public officer, who is authorized by law to make it. That term does not include the files and papers from which the record is made. 2 Bouv. Law. Dic. 849; 2 Am. & Eng. Enc. 474; *Perkins* v. *Cummings,* 66 Vt. 485; *Com.* v. *Rodes,* 1 Dana (Kan.) 595.

If these vouchers are public records, in order to make it the duty of defendant 'to exhibit them to the relator, he must allege and prove that he has a pecuniary interest in them. *Mitchell* v. *Boardman,* 79 Me. 469; *King* v. *Staffordshire Justices,* 6 A. & E. 99; *Queen* v. *Harrison,* 9 Q. B. 794; *Payne* v. *Staunton* (W. Va.), 46 S. E. 927; *Owens* v. *Woolridge,* 22 Pa. Co. Ct. 237; *Colon* v. *Orr,* 71 Colo. 43.

. Such an inspection as the relator demands would take weeks, and possibly months. Such an extended examination will not be granted by mandamus, even if the relator has the right to inspect them. *Buck* v. *Collins,* 21 Am. Rep. 236; *Webber* v. *Townley,* 38 Am. Rep. 213; *Bean* v. *Pope,* 7 Colo. 201; *Cormack* v. *Wolcott,* 37 Kan. 391; *Belt* v. *Abstract Co.,* 10 L. R. A. 212.


WATSON, J.    This is a complaint for mandamus to the Auditor of Accounts commanding him forthwith and without delay to exhibit the vouchers on file in his office to the relator, or to his agent and attorney.

The complaint sets forth that the defendant was, and still is, Auditor of Accounts of this State, and as such it was and is his duty to require all bills presented to him for allowance to be fully itemized and accompanied, as far as possible, with vouchers which shall be kept in his office, and at all proper times and under reasonable regulations to exhibit the same, upon request, to any citizen and taxpayer of the State having a legitimate interest therein which an inspection would subserve; that the relator desired to examine said vouchers and to that end employed an agent and attorney to act in his behalf and to make copies of such portions thereof as it should seem advisable.    The allegations in the complaint show that the relator personally and by his said agent and attorney at divers times requested the defendant to allow the relator or his said

agent and attorney to examine said vouchers at certain times named, also at any other time upon the reasonable convenience and in the presence of the defendant or his deputy and under any other reasonable regulations, and that the defendant refused and still refuses to comply with such requests. It is further alleged in the complaint that the relator and his agent and attorney are citizens and taxpayers of this State; that the relator had and has a legitimate interest in said vouchers which an inspection will subserve, in that he verily believed and still believes that there have existed and still exist gross negligence and misconduct in the management of the moneys of the State, and that he desired and requested the defendant to allow the examination of said vouchers to the end that the relator might investigate the management of said moneys, and discover such negligence and misconduct, and take such action as he should be advised to correct the same, if found to exist, of which reason he informed the defendant; that the relator cannot make such investigation nor discover any negligence and misconduct, if they exist, except by an examination of said vouchers; that the relator was not and is not actuated herein by motives of idle curiosity; and on information and belief that he has no adequate legal means of redress except by writ of mandamus.

In answer, the defendant denies in positive terms that the relator or his attorney requested the examination of the vouchers for the purpose set forth in the complaint; also that the relator cannot investigate the management of the moneys of the State, nor discover any negligence and misconduct therein, if they exist, except by such an examination; and that the relator has any legitimate interest in or to the vouchers, which an inspection would subserve. No other material allegations in the complaint are denied positively, but some are denied on information and belief, and as to some, the defendant in terms

puts the relator "to his proof" without any specific admission and without a denial in any form. The defendant sets forth in his answer that the reason why he refused the requests of the relator and his attorney to examine said vouchers was that he believed said vouchers were not public records and that under the law he had no right to permit them to be examined in any manner other than that provided by law; also the further reasons that the defendant was busily engaged in completing his biennial report to be submitted to the Governor and had arranged his files and vouchers so that the same might be readily examined and understood by the Committee on Claims of the General Assembly, soon thereafter to be in session, and they thereby be enabled readily to make their report to the General Assembly, as provided in section 320 of the Vermont Statutes; and by submitting the vouchers to the examination of citizens and taxpayers who might desire to examine them, they would become lost or so disarranged and misplaced that they would be nearly if not wholly valueless to the Legislative Committee or to the defendant without great trouble, expense, and delay in rearranging them; and also the further reason that said vouchers and files are no part of the public records of the State which the defendant is under duty by law to keep; but are vouchers belonging to the office of the Auditor of Accounts, justifying him for his allowances and payments thereunder, and his only protection for the issuing of orders upon the State Treasury.

An order was made fixing the time for taking and filing testimony on questions of fact not agreed upon by the parties, and testimony was taken and filed in accordance therewith by both parties.

Certain questions concerning the sufficiency of the complaint are raised by the defendant and he urges that they should be determined upon the general principles of pleading.

At common law and prior to the enactment of the Statute of 9 Anne, ch. 20, no pleadings were allowed in mandamus beyond the return which was taken as conclusive. If the return proved to be false, the only remedy of the relator was by action on the case for a false return. By the Statute of Anne in all cases of mandamus relating to municipal corporations and their officers, it was made lawful for the relator to plead to or traverse all or any of the material facts contained in the return, to which the defendant might reply, take issue, or demur; and such further proceedings are then to be had as could have been had if the relator had brought his action on the case for a false return. *King* v. *Mayor and Aldermen of London,* 3 Barn. & Ad. 255.

Are the provisions of this statute a part of the common law of this State?

In 1779, it was enacted that the "common law, as it is generally practiced and understood in the New England States, be, and is hereby established as the common law of this State." In *Giddings* v. *Smith,* 15 Vt. 344, in discussing this provision of the statute, it is said that "common law, as practiced and understood, probably meant, as considered or altered by statute or by judicial constructions, and as it was adapted to our local circumstances and usages, generally adopted. It is most probable they had reference to the common law as understood and established by usage, or the determination of the courts in Connecticut, as that appears to be the state to which the legislature had particular reference in passing laws."

In construing this statute with its peculiar provisions, reference must be had to the reports of judicial decisions in the several New England States as containing the most certain evidence of how the common law was then practiced and understood. In *Commonwealth* v. *Knowlton,* 2 Mass. 530, the court said: "Our ancestors, when they came into this new

world, claimed the common law as their birthright, and brought it with them, except such parts as were judged inapplicable to their new state and condition.   The common law thus claimed was the common law of their native country, as it was amended or altered by English statutes in force at the time of their emigration.   Those statutes were never reenacted in this country, but were considered as incorporated into the common law. Some few other English statutes, passed since the emigration, were adopted by our courts, and now have the authority of law derived from long practice." See also *Commonwealth* v. *Leach,* 1 Mass. 59; *Sackett* v. *Sackett,* 8 Pick. 309; *Boynton* v. *Rees,* 9 Pick. 528. And such was the law in Maine, as is seen from the fact that in the Act of Separation from Massachusetts, it was provided that all laws then in force and not repugnant to the constitution should remain and be in force until altered or repealed by the legislature or should expire by their own limitations, which provision was also made a part of the organic law of that state.   *Wilcox* v. *Cheviott,* 92 Me. 239.   English statutes adopted there have been regarded as a part of their common law.   *Colley* v. *Merrill,* 6 Me. 50.   In *State* v. *Rollins,* 8 N. H. 550, it is said that prior to the Act of April, 1777, there had been in force the common law, as far as it was applicable to their institutions, the English statutes made in amendment of it before the emigration, and such of those made after as were adopted in practice.   See also *State* v. *Moore,* 26 N. H. 448, 59 Am. Dec. 354.   In Rhode Island the statute provides that those English statutes, introduced before the Declaration of Independence, which have continued to be practiced under as in force, shall be deemed and taken as a part of the common law and remain in force until otherwise specially provided.   Gen. Laws, R. I. 1108; *Bishop* v. *Tripp,* 16 R. I. 198.   In Connecticut it is said that the English common law, not unadapted to local circumstances, was

brought thither at the time of the emigration and made their own by practical adoption; and that the same may be said of the ancient English statutes, not penal, whose corrective and equitable principles had become so interwoven with the common law as to be scarcely distinguishable from it. *Fitch* v. *Brainard,* 2 Day 163; *Card* v. *Grinman,* 5 Conn. 164. In *Strong's Case,* Kirby, 345, the action was mandamus, and the court was requested to direct whether the procedure should be governed by the common law, as it stood before the statute of 9 Anne, or by that statute. It was held that the statute should be the rule of proceeding.

The Vermont statute of 1779 was by reenactment to be and remain in force until the rising of the General Assembly in October, 1782. Yet without amending or repealing it, beyond such effect if any by implication, at the June session of that year, after reciting by preamble that it was impossible at once to provide particular statutes adapted to all cases wherein law might be necessary for the happy government of this people, and that the inhabitants of this State had been habituated to conform their manners to the English laws, and held their real estate by English tenures, and that the statute law of England was so connected and interwoven with the common law that our jurisprudence would be incomplete without it, it was enacted "that so much of the common law of England, as is not repugnant to the constitution or to any act of the legislature of this State, be, and is hereby adopted, and shall be, and continue to be, law within the State." And "that such statute laws and parts of laws of the Kingdom of England, as were passed before the first day of October, Anno Domini one thousand seven hundred and sixty, for the alteration and explanation of the common law, and which are not repugnant to the constitution, or some act of the legislature, and are applicable to the circumstances of the State, are hereby adopted and made,

and shall be and continue to be, law within this State; and all courts are to take notice thereof, and govern themselves accordingly."

Although the statute of 1782 is more specific, we think it no broader in meaning and includes no more than the Act of 1779, unless it be because of the date fixed prior to which the English statute may have been passed and yet be within the later act. It was in effect a reenactment of the earlier statute in terms showing how the common law was practiced and understood, with a limitation of statutes included therein. The statute of 1787 specifies such statute laws of England as are "for the explanation of the common law," and in the compilation of 1797, all mention of English statutes as such is omitted, and the provisions adopting the common law are in phraseology much like those contained in section 898 of Vermont Statutes. These various changes in the wording of the statute, however, were not intended to work a change in the law itself, and the statute should be construed as including within the common law adopted, such English statutes as fall within the limitations of the statute of 1782, which as before seen was largely declaratory of the law then existing. That such construction is the one which has been generally accepted and understood appears from its long and frequent application in practice. At common law the defendant in an action at law was confined to a single plea consisting of a single matter of defence to one and the same demand. By the statute of 4 Anne, ch. 16, sec. 4, it was made lawful for any defendant or tenant in any action or suit, or for a plaintiff in replevin, in any court of record, to plead as many several matters thereto, in several distinct pleas, as he should think necessary for his defence. Gould's Pl. VIII., sec. 18-20. Our statute contains no provision for pleading double in this manner, yet such several pleas, appearing on their face to be "according

to the form of the statute in such case made and provided," have ever been permitted in practice within the history of this State. This could be done only by considering the statute of 4 Anne in this respect as a part of the common law. Moreover, other portions of the statute of 9 Anne have been recognized by this Court as a part of our common law. In *State ex rel. Page* v. *Smith,* 48 Vt. 266, the petition was for leave to file an information in the nature of a writ of *quo warranto* against the respondents for usurping and exercising the office of directors of the Central Vermont Railroad. One question was whether, if insufficient cause was shown and leave was granted, a judgment of ouster would be awarded as a matter of right or as a matter of course. The Court said that at the time our statute was enacted and down to the then present time, the practice was settled and uniform in the courts of England, that after leave was granted and the information filed, the respondents had time and opportunity to plead to the information, and pointed out that the fourth section of the statute of 9 Anne required this. It was held that our statute gave merely jurisdiction to this Court of these prerogative writs, and prescribed no forms or rules for proceedings; "but by manifest implication, adopted the function and manner of use of the proceedings then uniformly practiced in the common law courts of England."

Here is a long established construction of our statute which should have the force of judicial determination. *Boyden* v. *Brookline,* 8 Vt. 284. Since the statute, 9 Anne, is applicable to our local situation and circumstances and is not repugnant to the constitution or laws, we think it must be considered as a part of the common law respecting pleadings and proceedings in actions of mandamus falling within its provisions.

In England, by 1 Win. IV. ch. 21, the provisions of the statute of Anne were extended to all cases of mandamus and to the same effect in this State is No. 74, Acts of 1876. By section one of the latter act, in any case proper for a writ of mandamus, the proceedings may be commenced by written complaint addressed to the Supreme Court, setting forth the facts warranting the issue of the writ and the judgment sought thereon, which Court or a judge thereof may thereupon make all proper orders for notice, for the making of answer, for the taking of testimony, for the time and place of hearing the cause, "and for all other matters necessary and required to bring such cause to issue, hearing and determination"; and by section four, upon the hearing, "the Court shall definitely determine the right involved, and render the appropriate judgment in the cause, and as if the writ had issued absolutely in the first instance."

A mandamus proceeding is an action at law and, under the practice in this State, the complaint takes the place of the alternative writ, the answer takes the place of the return, and subsequent pleadings may be had until an issue is joined for trial on the merits. The complaint, answer, and subsequent pleadings are to be governed by the rules of the common law and must contain in substance the essentials of good pleading in an ordinary action at law. *Fairbanks* v. *Sheridan,* 43 N. J. L. 82.

At the close of his answer, the defendant moved to dismiss the complaint on the ground, to the effect, that it does not contain allegations upon which a mandamus can issue; and he specifies in the motion the various omitted allegations which he claims are essential. But the defects there specified, if defects they are, pertain to the right of recovery on the merits and not to the correctness of the proceedings with reference to the complaint or its service. Hence advantage thereof

cannot be taken by motion to dismiss. *Alexander* v. *School District,* 62 Vt. 272; *Marsh* v. *Graves,* 68 Vt. 400; *Noyes* v. *Hyde Park,* 73 Vt. 261. Owing to the importance of the case, however, this motion will be treated as a motion to quash. If the complaint is defective in substance, advantage thereof may be taken by such a motion at any time before the peremptory writ is awarded. This is in principle very closely allied to a writ of error on which a judgment is reversed in a cause where the declaration shows no cause of action, or where the conviction is on an indictment which does not charge an offence. The proceedings fall for want of a proper foundation to sustain them. *King* v. *The Margate Pier Co.,* 3 Barn. & Ald. 224, 5 Eng. C. L. 266; *Rex* v. *College of Physicians,* 5 Burr. 2740; *Bank* v. *Canal Commissioners,* 10 Wend. 26; *Trustees* v. *People,* 12 Ill. 248, 52 Am. Dec. 488; *People* v. *Davis,* 93 Ill. 133.

It is alleged in the complaint respecting the defendant's duty that "as such auditor it was and is his duty to require all bills presented to him for allowance to be fully itemized and accompanied, as far as possible, with vouchers which shall be kept in his office, and at all proper times and under reasonable regulations to exhibit said vouchers, upon request, to any citizen and taxpayer of the State having a legitimate interest therein which an inspection will subserve." It is urged that the complaint is defective in that it does not state how the alleged duty of the defendant to exhibit the vouchers was created, nor facts which show whether it arose from contract or from some express provision of law. But the complaint should be construed in a manner consistent with itself, and when so construed we think the allegations in this respect are sufficient. They in positive terms show the official character of the defendant and his statutory duty to require such vouchers to be presented, and that they shall be kept in his office.

If by reason thereof it is the duty of the auditor to exhibit the vouchers to citizens and taxpayers as alleged in the complaint, —a question presently to be discussed,—it is so because that duty arises at common law. The rule is that courts are bound to take notice of all common law rights and duties and of general customs, and consequently they ought not to be stated in pleading. 1 Chit. Pl. 216; *Winifred Bros.* v. *Rutland R. R. Co.,* 71 Vt. 48.

It is further said that the complaint does not state that there were any such vouchers in the auditor's office at the time of the demand for an inspection and the refusal, nor what they were, nor what they contained; nor in direct or general allegations that the defendant at that time had any vouchers in his possession, nor that it was within his power to comply with the demand. The law making it the duty of the auditor to require vouchers is a public statute of which the Court will take notice, and it will also take notice of the general nature of the vouchers contemplated by that law. The allegations are direct and positive showing that it is these vouchers which the relator requested to be allowed to inspect. It is only necessary to describe the thing to be done with reasonable certainty, with such certainty that the defendant will know what is required of him. And it is held that this rule is peculiarly applicable to public officers who are commanded to perform a public duty, and especially where the facts constituting the act are within their personal knowledge. *People* v. *Nostrand,* 46 N. Y. 375. That such vouchers were in the auditor's office and therefore in his possession at the time of the demand and refusal, need not be averred in the complaint; for the law presumes that all officers intrusted with the custody of public files and records will perform their official duty by keeping them safely in their offices. *Morse* v. *Bruce's Estate,* 70 Vt. 378; *Deshong* v. *City of New York,* 176 N. Y. 475. And

where the law presumes a fact, it need not be stated in pleading.   1 Chit. Pl. 221; Stephen, Pl. 354.

It is insisted that the relator has not sufficiently alleged that he has no other adequate remedy.   It is true that the complaint contains no such averment, except on information and belief which is not sufficient.   But the fact that he has no other legal remedy is apparent from the other averments in the complaint, and that which already appears sufficiently in the pleading of either party without formal allegation, need not be expressly averred.   Gould's Pl. ch. 111, sec. 3.

Furthermore, it is said that the complaint contains no averment that the vouchers in question are public records, nor that the relator has a pecuniary interest in them.   If these vouchers are public records, they are so as a matter of law and no allegation thereof is necessary.   Whether they are of that character and whether the relator's interest therein must be pecuniary in nature to entitle him to the right of inspection, will be discussed later.

The material facts alleged in the complaint which are denied in the answer only on information and belief, and the facts alleged as to which the defendant answers that he neither admits nor denies, but calls upon the relator for his proof, are in the eye of the law admitted to be true.   It is elementary in the rules of pleading that each party tacitly admits all such traversable allegations on the opposite side as he does not traverse.   Gould's Pl. ch. 111. sec. 167; *Carpenter* v. *Briggs,* 15 Vt. 34; *Murdock* v. *Hicks,* 50 Vt. 683.   Under this rule, denials argumentative are not enough,—*Lyman* v. *Central Vermont R. R. Co.,* 59 Vt. 167,—nor on information and belief for it may be true that the pleader believes as he has been informed, and yet upon the face of the pleadings the fact be as alleged by his adversary.   *People* v. *Brooklyn,* 77 N. Y. 503; *People ex rel. Frost* v. *N. Y. C. & H. R. R. R. Co.,* 168 N. Y.

187; *State ex rel. Conran* v. *Williams,* 96 Mo. 13. Nor is refusing to admit or deny an allegation sufficient, since it is in legal effect a refusal to answer at all. *People* v. *Crabb,* 156 Ill. 155. But the allegation that it was and is the duty of the defendant to exhibit said vouchers, upon request, to any citizen and taxpayer of the State having a legitimate interest therein which an inspection would subserve, is not admitted under this rule, since the allegation is but a conclusion of law from the facts stated, and not traversable. Gould's Pl. ch. VII. sec. 48.

No traverse to the answer was filed by the relator. When such is the state of the pleadings the matters in controversy are usually determined on the complaint and answer. But in this case testimony was taken, filed, and used at the hearing by both parties without objection. They thereby treated the case as if a traverse had been filed and we treat it in the same way.

The defendant denies that the vouchers which the relator wished to inspect are public records, and if this contention is sound it is decisive against the existence of the right of inspection claimed by the relator.

Of what do the vouchers consist? In determining this question, it becomes necessary to examine the statute prescribing the auditor's duties. By Vermont Statutes, sec. 306, "He shall examine and adjust all claims against the State, not otherwise specially provided for by law, in favor of persons acting under the authority of the State or of the executive, including military accounts referred to him by the Governor, and allow such sums as he finds justly due, and draw orders on the State Treasurer therefor." Sec. 307, "He may examine the claimant or other person under oath, and for that purpose may administer oaths, and shall require proof of a claim equivalent to testimony upon oath, or a certificate of some commissioned

officer of the State officially cognizant of the claim." Sec.
308, "He shall make a record of claims presented, and when
he disallows a claim in whole or in part, he shall, at the request
of the claimant, refer such claim to the General Assembly. If
the claimant neglects to apply to the General Assembly at the
next session, or if it acts upon said claim, allowing it in whole
or in part, or rejecting it, the claim shall be treated as adju-
dicated." Sec. 309, "He shall when a claim is allowed either
in whole or in part by himself or the General Assembly upon
his reference place the original account or evidence of the
claim on file, and draw an order upon the State Treasurer,
giving the nature of the claim, payable upon the tenth day of
the succeeding month, or at sight in his discretion; but he shall
not deliver such order until the claimant gives him a receipt
in full for such claim." Sec. 328, "All state officers whose
duty it is to disburse moneys belonging to the State, shall make
returns to the State Auditor, and embody in their biennial
reports, itemized statements of all their expenses and disburse-
ments." Sec. 329, "The State Auditor shall make a settle-
ment at least once in each fiscal year with the sergeant-at-
arms, quartermaster general, county clerks, superintendents of
the state prison, house of correction, Vermont industrial school,
Vermont asylum, and soldiers' home, the secretary of the board
of agriculture, fish commissioners and any other officer who
disburses moneys appropriated by the State, and adjust their
accounts, and draw an order for any balance due them; and
he shall require them to pay into the treasury any balance due
the State." Sec. 305, "He shall require all bills presented to
him for allowance to be fully itemized and accompanied, as far
as possible, with vouchers, which shall be kept in his office,"
and by sec. 327, "He shall allow no claim not based on law,
nor draw an order except in pursuance of law; and no other
officer shall draw orders on the State Treasurer."

The law of all other sections in chapter twenty-four of the Vermont Statutes, except of section 299 which relates solely to the oath of office, was in force when section 305 was enacted as No. 8 of the Laws of 1892.

The term "bill," as used in the last named section, includes all claims and accounts which by law may be presented to the auditor for allowance; and the term "vouchers," as there used, includes all books, papers, receipts, receipted bills, and documents which serve to prove the truth of the claims and accounts so presented.

It is a basic principle of evidence that where a document is of a public nature, a copy of it is evidence, for the production of the original is dispensed with on account of the inconvenience which would result from the frequent removal of public documents, and consequently the absence of the original affords no presumption of fraud. Stark. Ev. Part III, sec. 14; *Lynch* v. *Clarke*, 3 Salk. 154, 11 Eng. R. C. 450; Wigmore, Ev. sec. 1218; *Mattocks* v. *Bellamy*, 8 Vt. 463.

True, under this rule, it has been held in England that copies of the books of the Bank of England and of the East India Company, and perhaps of some other companies, legally private corporations, might be used since the books are not removable on the ground of public inconvenience. But these books have been held to be of a public nature. Thus they are brought within the rule rather than made an exception to it. *Marsh* v. *Colluett*, 2 Esp. 665, 11 Eng. R. C. 508; *Doe* v. *Roberts*, 13 M. & W. 520. The same is true regarding the books of the Bank of the State of Alabama and its branches. The banks are held to be the property of the public and their books are held to be public writings. *Crawford* v. *Bank*, 8 Ala. 79. In the case of *People* v. *Hurst*, 41 Mich. 328, the rule seems to be extended to banks generally, and there may be other instances of like nature. The generally recognized rule,

however, at common law is that this principle does not apply to documents of a private nature. Respecting them, a copy is not evidence unless the original is lost, destroyed, or in the hands of a third person who cannot be compelled to produce it.

In Wigmore on Evidence, sec. 1218, in stating the conceivable scope of this principle allowing proof by copies, it is said among other things: (1) "when by statute or regulation a document in official custody is expressly or impliedly *forbidden to be removed,* it is clear that the principle applies and production dispensed with. (2) Where the document is one of the *working documents* of the office containing the official doings or being a paper made and consulted there officially in the course of office duty, it is equally clear that it need not be produced. (3) When the document is one made by a *private person* and *filed* in a public office, the principle does not apply, if a statute or regulation does not expressly require it to be filed and kept there; if it does so require, then the principle applies; although the rulings lay down no clear distinction on the subject, and most of the instances are dealt with by a statute in general or specific terms. (4) Where the document is one made by a private person and required by law to be *recorded* in the public office but not to be kept there, the principle does not at common law apply. (5) Where the document is made by a public officer and is delivered, after being recorded, to a private person (as a government land certificate), the principle does not apply; but by statute in many instances it has either been made to apply or the record has been constituted the basis of title, so that the record, as the original being in official custody, need not be produced."

It will be observed by this classification that in all instances where by law or regulation the document is filed in a public office and required to be kept there, it is of a public nature as far as the law of evidence is concerned. The same

test has often been applied, and we think rightly so, in determining the nature of books and documents in proceedings to compel the allowance of their inspection.

Claims are not to be allowed against the State unless they are based on law and are supported by evidence equivalent to testimony upon oath, or a certificate of some commissioned officer of the State officially cognizant of the claim. By the provision of the statute that vouchers shall be required by the Auditor to accompany as far as possible all bills presented for allowance, the General Assembly has declared for the production of that which, in contemplation of law, is generally the best evidence for that purpose. And that this evidence may be preserved for any future use or examination which may lawfully be had, the statute provides that the vouchers, whatever may be their specific nature, shall be filed and kept in the Auditor's office. Certainly they are within the first class named by Wigmore, and may be within the third. If vouchers so used, filed, and kept were not before of a public nature because made or presented by some other public officer in the discharge of a public duty, they thereby are stamped with that character and thenceforth are public documents. *Brown* v. *County Treasurer,* 54 Mich. 132, 52 Am. Rep. 800; *Ferry* v. *Williams,* 12 Vroom 332, 32 Am. Rep. 219; *People* v. *Jewell,* (Mich.) 101 N. W. 835; *Conran* v. *Williams,* before cited; *Clay* v. *Ballard,* 87 Va. 787.

The same principle was applied in *State ex rel. Cook* v. *Reed, Treasurer,* 36 Wash. 638, 79 Pac. 306, but the writ was denied, since the stub books which the relator asked to examine were kept by the treasurer of his own volition and for his own convenience and were not public records such as he was required by law to keep. Also in *Leffingwell* v. *Miller* (Colo.) 79 Pac. 327, where the appellee sought by mandamus proceedings to compel the appellant to deliver over to him, as suc-

cessor in office, certain books alleged to pertain to the office of city engineer. The books which the defendant refused so to deliver contained field notes made by him in surveying lots of individual owners upon their application, in his individual and not official capacity. It was held that the field notes made in performing such work were the defendant's private property and did not pertain to the office of city engineer, hence the proceedings were dismissed.

Moreover, it would seem that all vouchers, files, papers, and records required by law to be kept in the office of the Auditor of Accounts are, by the law-making power, deemed of a public character; for at the last session of the General Assembly the Auditor was made a certifying officer whose certified copy of any such voucher, file, paper, or record, shall be admitted in evidence in any suit, civil or criminal. And it is made his duty to furnish such copies to any person desiring the same on the payment or tender of the specified legal fee therefor. Laws of 1904, No. 24.

Since the vouchers in question are public documents in a public office, the question arises whether citizens and taxpayers of the State have a right to inspect them. In I Tidd's Prac., Fourth Am. ed., p. 593, it is laid down as a general rule that a party has a right to inspect and take copies of such books, etc., as are of *public* nature, wherein he has an interest. And regarding the inspection of public documents, it is said in 1 Greenleaf on Evidence, sec. 471, "it has been admitted, from a very early period, that the inspection and exemplification of the records of the King's Courts is the common right of the subject." It further appears from the same author that, when not injurious to the public interests, inspection of books of public officers will be granted in favor of persons who have an interest therein. And when no action is pending the proper course is to make appli-

cation for a rule to show cause why a mandamus should not issue, commanding the officer in custody of the books to permit an inspection thereof and the taking of copies, stating in the application the object sought by the inspection.     Sec. 474-478. By a law in Virginia, the secretary of the Electoral Board in the several counties and cities of the commonwealth is required to keep in a book to be provided for that purpose, an accurate account of all the proceedings of the Board, including all appointments and removals of judges of election and registrars.     The printing of official ballots and their distribution to the judges of election of the several precincts in their county or city is delegated to this board.     In *Gleaves and Others* v. *Terry,* 93 Va. 491, the relators, citizens and voters of Wythe County, prayed for a mandamus commanding the defendant, secretary of the Electoral Board of that county, to allow the relators to examine the records of said board and to take memoranda or copies thereof.     It was held that the preparation of the ballot, its verification, and the stamping of the seal of the board thereon were required by statute to be performed in secret, and that so much of the record of the proceedings of the Board as related thereto was not a public record which was open to inspection by any one other than the officers whose duty it was to prepare the ballot, etc.     But that so much of the record of the proceedings of the Board as related to the appointment and removal of judges and commissioners of election and registrars or the ordering of a new registration, was a public record open to inspection by any citizen or voter of the county and that he might take memoranda or notes of the proceedings therefrom.     See also *Burton* v. *Twite,* 78 Mich. 363.

We think it may be safely said that at common law, when not detrimental to the public interest, the right to inspect public records and public documents exists with all persons who

have a sufficient interest in the subject-matter thereof to an-
swer the requirements of the law governing that question.
Furthermore, we think the existence of this right in respect to
vouchers, files, papers, and records in the office of the Auditor
of Accounts is impliedly recognized by the Act of 1904, to
which reference has been made, since the full and intelligent
exercise of the right to certified copies is dependent upon the
right of inspection to ascertain of what particular records and
documents copies are desired. In Alabama it has been held
that a similar statute requiring the auditor of the state, on
application and payment of legal fees therefor, to furnish a
certified copy of any paper required to be kept in his office,
implies that there is a right first to see the paper, for how,
asks the Court, could it otherwise be known whether or not it
could be of any use? *Brewer* v. *Watson,* 61 Ala. 310.

It appears from the evidence taken, as well as from the
allegations in the complaint, that the relator has no particular
right or interest to be protected by the inspection requested,
independent of that which he holds in common with all other
citizens and taxpayers of the State.

Is this a sufficient interest to entitle him to the relief
sought?

As a part of our organic law, it is laid down: "That all
power being originally inherent in and consequently derived
from the people, therefore, all officers of government, whether
legislative or executive, are their trustees and servants; and at
all times, in a legal way, accountable to them." Const. Art. 6.
It has been said by an eminent writer in speaking of the Ameri-
can Nation,—and it is no less true when applied to one of the
individual states,—"every man knows that he is himself a part
of the government, bound by duty as well as by self-interest
to devote part of his time and thought to it." Again the same
writer says: "The American citizen is virtually one of the gov-

ernors of the republic.    Issues are decided and rulers selected
by the direct popular vote.    Elections are so frequent that to-
do his duty at them, a citizen ought to be constantly watching
public affairs with a full comprehension of the principles in-
volved in them, and a judgment of the candidates derived
from a criticism of their arguments as well as a recollection
of their past careers."    2 Bryce, Am. Com. 277.

The testimony of the relator shows that he believes that
there have been and still are gross negligence and misconduct
in the management of the moneys of the State, because it
appears from the Auditor's published reports that for the thirty
years ending June 30, 1901, the total current expenses of the
State increased about one hundred twenty-five per cent., and
that for the last biennial period, the average annual increase
was more than ninety-eight thousand dollars, that the total
expense for the care of the insane increased during the ten
years ending June 30, 1901, about one hundred twelve per
cent., while the population of the State during the thirty years
before mentioned increased only about four per cent.    His tes-
timony further shows that in the published reports of the
Auditor sufficient detail of the expenses in the various depart-
ments is not given to render it possible to ascertain therefrom
in what departments there has been an undue and unreasonable
increase of expenses, but that the vouchers on file in the Audi-
tor's office contain such details and an examination of them
is the only means of obtaining the information; that a full
knowledge of these details is indispensable to a full under-
standing of the matter and for the adoption of such reform
in the accounting department and the various other depart-
ments of the State as will reduce the expenses to the proper
amount; and that his purpose is to have an investigation made
of the Auditor's accounts for the receipt and disbursement of
the State's money.    The relator denies that in seeking this

inspection he is actuated at all by motives of curiosity, but his purpose is to understand all such items of expense, to analyze the same, make up proper statements therefrom which will show wherein the various items of expense are unnecessary or excessive, bring the matters before the voters of the State, and personally together with other citizens and taxpayers to advocate and bring about reforms in the Auditor's and other departments of the State, which will reduce the expenses to the proper amount and thereby save the State large sums of money.

As before seen the statute points out the way to be followed by the Auditor of Accounts in the performance of his duties in passing upon claims presented for allowance, and "he shall allow no claim not based on law nor draw any order except in pursuance of law." Whether these injunctions have been and are followed in the performance of the duties of that office is a question involving public rights in which all citizens and taxpayers are alike interested. If by negligence or misconduct, to use the words of the complaint, bills have been or are being allowed contrary to the plain intent and meaning of the law, public policy demands that such evils be remedied and that all proper facilities shall be afforded to bring about this result. For this purpose, under reasonable rules and regulations to inspect the public records and public documents there kept, is a right which rests with the citizens and taxpayers of the State. It logically follows that, as correlative to this right, it is a legal duty which the Auditor owes to the public by virtue of his office to accord that right, when in contemplation of the law an occasion has arisen for its exercise. This duty is ministerial in its nature, and so clear and specific that no element of discretion nor of official judgment is involved in its performance. The refusal to perform it under circumstances where the law requires it, is a detriment to the public interests and mandamus will be awarded in a case which shows

facts essential to the granting of such relief. High Extr. Legal Rem., sec. 24.

It is true that the office of Auditor of Accounts is a branch of the executive department of the State, but this does not place the incumbent of that office beyond the reach of the remedy here invoked to compel the performance of purely ministerial public duties which appertain to his office. In the case of *United States* v. *Black*, 128 U. S. 40, 32 L. ed. 354, the relator made application for a writ of mandamus to be directed to the defendant Black, as Commissioner of Pensions, commanding him to reissue to the relator his pension certificate. In the opinion by Mr. Justice Bradley, upon an examination of the cases previously before that Court involving the question of when such a writ may and when it may not be granted against executive officers of government, the following principle of law is deduced: "The Court will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the Court having no appellate power for that purpose; but when they refuse to act in a case at all, or when, by special statute, or otherwise, a mere ministerial duty is imposed upon them, that is, a service which they are bound to perform without further question, then, if they refuse, a mandamus may be issued to compel them." *Marbury* v. *Madison*, 5 U. S. 137, 2 L. ed. 60; *McBride* v. *Schurz*, 102 U. S. 378, 26 L. ed. 167; *Kendall* v. *United States*, 37 U. S. 524, 9 L. ed. 1181.

It is contended by the defendant that to maintain mandamus the relator must show some pecuniary interest in the subject-matter, and in support of this contention, numerous cases are cited from other jurisdictions which so hold. We think the true rule, however, is that stated by Mr. High in his work above cited, sec. 431. He says: "A distinction is

taken between cases where the extraordinary aid of a mandamus is invoked merely· for the purpose of enforcing or protecting a private right, unconnected with the public interest, and cases where the purpose of the application is the enforcement of a purely public right, where the people at large are the real party in interest. And while the authorities are somewhat conflicting, yet the decided weight of authority supports the proposition that, where the relief is sought merely for the protection of private rights, the relator must show some personal or special interest in the subject-matter since he is regarded as the real party in interest and his right must clearly ·appear. Upon the other hand, when the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the·people are regarded as the real party in interest, and the relator at whose instigation the proceedings are instituted need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen and as such interested in the execution of the laws."

In *Union Pacific R. R. Co.* v. *Hall and Morse,* 91 U. S. 343, 23 L. ed. 428, the plaintiff in error had built its railroad with the eastern terminus at Omaha, Nebraska. The defendants in error contended that by the charter of the road, the eastern terminus must be at Council Bluffs, Iowa, and that the road must be operated as one continuous line westward therefrom. The defendants in error sought a writ of mandamus to enforce the building of a bridge across the Missouri River between Omaha and Council Bluffs, and the operation of the road according to law. One question raised was whether Hall and Morse, the defendants in error, could lawfully become relators in a suit in behalf of the public without the assent or direction of the Attorney-General of the United States, or of the district attorney of the District of Iowa, to

compel the performance of a public duty.  Hall and Morse
were merchants in Iowa, having frequent occasion to receive
and ship goods over the company's road; but they had no in-
terest other than such as belonged to others engaged in like
employments, and the duty they sought to enforce by the writ
was a duty to the public generally; thus presenting the ques-
tion whether a writ of mandamus to compel the performance
of a public duty may be issued at the instance of a private
relator.  After recognizing the fact that in this country there
had been a diversity of decision upon that question, unless the
non-performance of the public duty worked a special injury
to the relator, the Court, speaking through Mr. Justice Strong
and citing many authorities, said: "There is, we think, a
decided preponderance of American authority in favor of the
doctrine that private persons may move for a mandamus to
enforce a public duty, not due to the government as such,
without the intervention of the government law officer."  In
*Clay* v. *Ballard,* 87 Va. 787, the relator, a legalized voter,
sought a writ of mandamus to compel the registrar of a
certain election district to allow·him to inspect and take copies
of the registration books of the district.  It was held that the
relator had the right of inspection which included the right to
take copies, both at common law and by statute, and that the
duty, performance of which was sought to be coerced, was a
public duty, and hence the interest which the relator as a citi-
zen had in the enforcement of the laws was a sufficient interest
to entitle him to maintain the proceeding.  In *Payne* v. *Staun-
ton,* 55 W. Va. 202, an election was held in Kanawha County
under a statute for that purpose, upon the question whether
bonds should be issued to fund the indebtedness of the county.
The returns of the election were made and canvassed, the re-
sult ascertained, and the poll-books and ballots were returned
to the office of the clerk of the county court.  The relators

applied to the defendant, clerk of the county court, to be allowed to inspect the poll-books of the election for all the precincts of the county, which he refused. They then demanded that the clerk make them certified copies of certain ones of the poll-books, offering to pay therefor, which demand was also refused. The mandamus proceedings were brought to compel the clerk to allow such inspection and to furnish such copies as the relators might require. Among other things, it was contended by the defendant that the relators could not join in a mandamus. Hereon the Court said that without strain it may be said that all citizens have a common interest in seeing that records in a clerk's office are preserved and that proper inspection be granted, as it is that the county be supplied with a court house. "Is this not a matter of common public right, and may not citizens unite to vindicate it?" But as the relators united in the demand for inspection, the demand was joint, the refusal to all in common, and the wrong a single one to all alike. The case of *King* v. *Justices of Leicester*, 4 B. & C. 891, obviously in many features is similar to the one before us. The Attorney-General obtained a rule against the defendants to show cause why a mandamus should not issue, commanding them and the clerk of the peace of the borough of Leicester, "to permit and suffer the parishioners of the parish of Saint Martin, in said borough, or any of them, to inspect and take copies of all orders of sessions, rates, and other proceedings of the general quarter sessions of the said borough, relative to rates imposed upon the said parishioners by the justices of the said borough, or to which they are contributory, and all accounts and documents relating thereto." The rule was obtained on an affidavit made by two rated inhabitants of the parish, stating in substance that the rates had recently become very burdensome to the inhabitants, and that although an abstract of the treasurer's receipts and expendi-

ture had of late years been annually published, yet such abstract did not afford due information to the contributors to said rate; that the money levied upon them was expended for such purposes only to which the same was applicable by law; that upon due investigation they doubted not, and believed it would appear, that the said justices had raised greater sums upon the inhabitants than were necessary and warranted by law; and that the parishioners, being desirous of obtaining better information respecting the purposes to which the money raised by such rate was applied, an application had been made by Samuel Miles, attorney for the inhabitants of the parish, to be permitted to inspect and take copies of all such orders of sessions, rates, and other proceedings, and all accounts and documents relating thereto. In answer, an affidavit stated that an abstract of the treasurer's accounts of all his receipts and expenditure had been published each year according to the statute, and the affidavit set forth the abstract published for the last two years. In argument, the points were made for the defendants that the affidavit upon which the rule was granted did not allege any particular grievance or instance of misapplication of the funds in question, but merely stated that the deponents "doubted not" and "believed" that such misapplication would appear to have been made; that no statute gave such right of inspection; and that the statute points out the way by which the public are to be made acquainted with the expenditure of the county rate, namely, by publication of an abstract of all the treasurer's receipts and expenditure, signed by the justices who audited the same, once a year in a public local newspaper, which had always been done. In reply to the last point, it was urged that the abstracts published and set forth in the answer were not sufficient to give the contributors the information they required, and that every rate-paying inhabitant had the right to inspect and take copies. Abbott,

C. J., directed a mandamus to issue to permit Miles, on behalf of the parishioners, to inspect and take copies of the last two rates' or assessments made by the justices for the said borough, and all orders made for the expenditure of the same, and the several orders of sessions made thereon, and other proceedings and documents relating thereto, and that thus the rule be made absolute.

In *Rex* v. *Guardians, etc. of Great Faringdon,* 9 B. & C. 541, a rule *nisi* for a mandamus to the guardians, churchwardens, and overseers of the poor of the parish of Great Faringdon, commanding them to allow R. B. Gill, an inhabitant of the parish and liable and entitled to be rated to the rates for the relief of the poor therein, to inspect the books of accounts of the receipts, expenditure, and application of the rates of the parish, and to take copies thereof and abstracts therefrom at his own costs. It appeared by affidavit that the accounts of the guardians, with the vouchers, were regularly produced at a meeting held the first Monday in every month, for the inspection and examination of the parishioners, and were so inspected and examined; that at a meeting named, such accounts for the last year were produced for the inspection of the parishioners, and having been approved, were verified upon oath by the acting guardian, etc. Lord Tenterden, C. J., said: "We have no doubt that the party is entitled to inspect the books at a reasonable time. * * * He has a right to see what has been done. The rule therefore must be made absolute." And in *Rex* v. *Justices of Staffordshire,* 6 A. & E. 84, Lord Denman, C. J., said: "We are by no means disposed to narrow our own authority to enforce by mandamus the production of every document of a public nature, in which any one of the King's subjects can prove himself interested. For such persons, indeed, every officer appointed by law to keep records ought to deem himself for that purpose a trustee."

In *State ex rel. Thomas* v. *Hoblitzelle,* 85 Mo. 620, the case was an appeal from the judgment of the Circuit Court of the city of St. Louis, awarding a peremptory writ of mandamus directing the defendant to allow the relator to inspect the registration lists, poll-books, and lists used in the election recently held in that city and on file in the office of the defendant as recorder of voters. At that election, the relator was a candidate for the office of city marshal and one Neiser was also a candidate for the same office and received a certificate of election. The relator alleged that he received a majority of the votes cast and was in fact duly elected; that he intended to contest the election with a view of establishing his right to the office; and that for the purpose of preparing for such contest he demanded of the defendant that he and his attorney be permitted to inspect the registration list and poll-books used at the election, which defendant refused. It was held by an undivided court that the peremptory writ should issue. Sherwood, J., wrote a concurring opinion with which Henry, C. J., agreed. Therein it said that the right of citizenship alone confers the right of relatorship in case of this sort, and "the records being public ones; records pertaining to the preservation of the evidence of the exercise of one of the highest and most sacred rights of a freeman; a right which constitutes the foundation stone of American liberty and national government, it is not too much to say that the right, within reasonable bounds, of inspecting such records is no less broad than the right of citizenship on which it rests." In a later case before the same court,—*State ex rel. Conran* v. *Williams,* 96 Mo. 13,—the right to take copies of these registration books and registration lists to be used by a voluntary political organization at a primary election to be held in the city of St. Louis under a primary election law was in question. The relators constituted the democratic central commit-

tee of that city.   It was held that the registration lists were public records and as such were competent evidence at such elections, and that since they were public records the right to inspect carried with it the right to take copies.

By a provision in the charter of the town of Orange in the State of New Jersey, no person should be allowed to sell ale, etc., within the city limits, unless he was first licensed by the collector of taxes, had paid a license fee, and had filed with the collector a letter of recommendation signed by six legal voters and freeholders who had signed no other recommendation within a year to the effect that the applicant for a license was of good moral character and of good repute for temperance.   In *Ferry* v. *Williams,* 12 Vroom  332, 32 Am. Rep. 219, the relator, a citizen of Orange, believing that the requirements of the law as to these letters of recommendation were not obeyed and desiring with other citizens to secure a due observance of its provisions, applied to the collector of taxes for an inspection of the letters on which then existing licenses had been granted.   This request was refused and the relator sought a writ of mandamus to enforce his alleged right of inspection, the existence of which right the collector denied. There was no statute in the state on the subject, hence the case was determined on common law principles.   The relator asserted no interest to be subserved by the inspection desired, except that common interest which every citizen has in the enforcement of the laws.   It was held that the relator was entitled to an inspection of the letters and the writ was granted.

In *State ex rel. Wellford* v. *Williams,* 110 Tenn. 549, L. R. A. 418, the relator, a resident citizen and taxpayer of the city of Memphis, alleged that the defendant was mayor and chief executive of the city and as such had the custody of its books on which were kept the receipts and expenditures of the funds of the city; that in the said receipts and expenditures, he, as a

citizen and taxpayer, had a direct interest; that some time before the filing of the petition, he uninvited attended a meeting of two hundred invited citizens, called by the mayor for the purpose of devising ways and means to assist the city to pave, repair, and "round up" more or less, the streets of the city, and being interested in the material prosperity of the city, he afterward attended a meeting of a committee of fifteen appointed at the aforesaid meeting of citizens; that the relator, being interested as a corporator and taxpayer, the financial condition of the city showing necessity for the providing of additional means for the purpose aforesaid and the tax rate being very high and burdensome, he later demanded of the defendant the right to make an examination of the books, records, papers, and vouchers in his possession, claiming the right to make a general inspection of the public records of the city and to make copies of its public documents and records, under such rules and regulations as would ensure their safety; which demand was refused. In disposing of the case in favor of the relator, upon an examination of many authorities both English and American, the Court said that under the circumstances it was natural that a citizen and taxpayer should desire to know the exact condition of the city's finances, and the plan of a thorough and exhaustive examination necessarily arose in the mind; and that the purpose which he professed was to ascertain the real condition of affairs, how much money had come in, and where it had gone to, as a necessary preliminary to fiscal ameliorations; that it cannot be doubted under a state of facts showing it to be important to the public interest that the general examination of the books of a municipality should be had, that the Court should allow such examination at the suit of one who is a citizen and taxpayer of the corporation; that the right rests not only on the ground that the books are public books, but also on the same principle that authorizes a

taxpayer to enjoin the enforcement of illegal contracts entered into by the municipality, county, or state, for the protection of the applicant and all other taxpayers from illegal burdens; that it is obvious that in making and enforcing such application the taxpayer acts, in a very real sense, not only for himself but for all other taxpayers; and acts therefore in the capacity, as it were, of a trustee for all; and that it must be admitted also that the exercise of such power, if prudently and carefully guarded, cannot be otherwise than salutary, because the knowledge that it can be exercised by a citizen and taxpayer, and may be exercised when the public good shall seem, on sound reason, to demand it, cannot result otherwise than in producing an added sense of responsibility in those who administer the affairs of municipal corporations, and in inducing a greater carefulness in the discharge of the trusts imposed upon them by their fellow-citizens under the sanction of law.

In *State ex rel. Colscott* v. *King,* 154 Ind. 621, the case was heard on demurrer to a petition for a writ of mandamus against the auditor of Franklin County to compel him to allow the relator an inspection of the public records and papers of the auditor's office. The relator was a citizen and taxpayer of the county and averred in his petition that he prosecuted the suit on his own behalf and on behalf of all other citizens and taxpayers in the county who were aggrieved by the wrongs set out in the petition; that he desired such inspection for the purpose of ascertaining whether said books and records, etc., were legally and properly kept, and especially for the purpose of discovering whether the money and property of the county had been duly accounted for by the persons and officers charged with the collection and disbursement of the same, and to ascertain whether any money was due to the county from any person or persons; and that he desired such inspection and the information to be obtained thereby as a citizen and taxpayer

for the purpose of pursuing, if necessary, the proper legal remedies to enforce the collection of any money or demands that may be due the county, and to require the proper authorities to enforce such demands. On demand the auditor refused to allow such inspection. In that state, there was a statute providing that "all the books, accounts, vouchers, papers and documents, touching the business or property of the county, shall be carefully kept by the auditor and open to the inspection of any person." No interest was asserted by the relator other than that which was common to all citizens and taxpayers of the county. It was held that, aside from the statute, the relator had shown by the facts presented such an interest in the matters to which the records and papers in question related, as would entitle him to a general inspection thereof for the purpose which he had in view. Speaking of the rights of the people, the Court said: "As taxpayers they contribute to the public revenue, and as voters they select the public officials who are to administer the county's affairs. Surely, under such circumstances, they retain or have a great interest in the proper management of the business and matters pertaining to their county, and therefore are entitled to know whether the public officials whom they have selected to represent them have properly used, disbursed, and accounted for the public funds which, under the law, have been confided to their custody and administration."

The statute provides that the Auditor's biennial report shall be examined by the Committee on Claims of the General Assembly in order to correct allowances which appear excessive; and that such committee shall examine his record of claims presented against the State, and his proceedings thereon, and make report to the General Assembly. V. S. 320. In 1904, this section was so amended that the committee in making their examination of the record of claims presented against

the State and the Auditor's proceedings thereon, may examine the vouchers, files, and papers of his office connected therewith, and that the meetings of such committee shall be open to the general public. Laws of 1904, No. 21. But the examination by the committee is not exclusive. It cannot be said that this statute either expressly or impliedly takes away any right of inspection which may exist at common law. There is nothing indicating that such was the intention of the Legislature. In *State ex rel. Colscott* v. *King,* it was contended that the statutory right and duty of the county commissioners to inspect and examine the records must be held to be an exclusive one, and impliedly deprived any citizen or taxpayer of that right when he sought it for the purpose which the relator in that case had in view. But it was held that there was no force in this contention. And the case of *State ex rel. Wellford* v. *Williams* is to the same effect. See also *King* v. *Justices of Leicester,* and *Rex* v. *Guardians, etc. of Great Faringdon,* before cited.

Upon principle and authority we think the interest of the relator, as a citizen and taxpayer, in the matters and things to which the vouchers in question pertain is sufficient to entitle him to an inspection of the vouchers for the purpose which he has stated.

We are asked in the exercise of discretion not to grant the relief sought. But it is clear that the relator has no other adequate remedy, and the fact that the allowance of such inspection by citizens and taxpayers will be an inconvenience to the office of Auditor of Accounts or to those legally in charge thereof, affords no good reason for refusing it. The Auditor of Accounts is the lawful custodian of the public records and public documents in that office and is responsible for their safe keeping; and he may make and enforce such reasonable rules and regulations regarding their inspection as may be necessary for their safety, and to prevent disproportional interference

with the proper performance of the duties of the office, and consistent with the public right here declared.

*Judgment that the prayer of the complaint is granted, and that a mandamus issue directing the Auditor of Accounts to grant the inspection of the vouchers in question to the relator and his said agent and attorney, under such reasonable rules and regulations as he may prescribe therefor consistent with the public right, without costs.*

MUNSON and HASELTON, JJ., dissent.

START, J., by reason of his illness took no active part in the decision of this case.